UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

BRUCE LANGFITT,

     Plaintiff,

vs.                        CASE NO: 8:08-CV-1377-T30-MSS

FEDERAL MARINE TERMINALS, INC. and
BBC CHARTERING AND LOGISTIC
GMBH CO. KG,

     Defendants.

_____/

## DEFENDANT FEDERAL MARINE TERMINALS, INC.'S MOTION FOR FINAL SUMMARY JUDGMENT

COMES NOW, Defendant FEDERAL MARINE TERMINALS, INC. (hereinafter "FMT"), by and through the undersigned counsel, and files this its Motion for Final Summary Judgment pursuant to Rule 56, Fed. R. Civ. Pro.  Defendant FMT seeks summary judgment in its favor as to Count I of Plaintiffs Amended Complaint (Dkt #18) sounding in negligence.  The grounds for this request are that: (1) there is no genuine issue of material fact in opposition to the undisputed proposition that Plaintiff, BRUCE LANGFITT was, at all times material hereto, the "borrowed servant" or "borrowed employee" of FMT, after being "loaned" by a temporary labor agency, Able Body Labor Temporary Services (hereinafter "Able Body")  to FMT pursuant to both an ongoing verbal agreement or arrangement <u>as well as</u> a written work order between FMT and Able Body, to help or assist FMT in the loading of an oceangoing vessel, the SJARD, on December 13, 2007 at FMT's docks located at Port Manatee, Florida.

The substantial matters of law to be adjudicated by the Court in the instant motion are whether or not Defendant FMT has satisfied the majority of the nine elements outlined by the Fifth Circuit Court of Appeals in Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1969) sufficient to qualify FMT as the "borrowing" employer for purposes of worker's compensation "borrowed servant" immunity from this third party, personal injury litigation. The undisputed facts are that: (1) Federal Longshore and Harbor Workers Compensation Act (hereinafter "LHWCA") benefits have previously been, and continue to be paid to Plaintiff LANGFITT as a result of this industrial accident and injury from a worker's compensation insurance policy procured by Able Body as part of an existing contractual agreement and requirement between FMT and Able Body, pursuant to which FMT was both a certificate of insurance holder and an endorsed "alternate employer"insured; (2) 33 USC §905(a) clearly applies, under the case law construing same, to both "lending" and "borrowing" employers, and holds that the worker's compensation liability prescribed by 33 USC §904 "...shall be exclusive and in place of all other liability of such employer to the employee...," thereby immunizing Defendant FMT from civil liability in the instant personal injury litigation.

The nine Ruiz "borrowed servant" elements are: (1) who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?; (2) whose work is being performed?; (3) was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?; (4) did the employee acquiesce in the new work situation?; (5) did the original employer terminate his relationship with the employee?; (6) who furnished the tools and place for performance of job?; (7) was

2

the new employment over a considerable length of time?; (8) who had the right to discharge the employee?; and (9) who had the obligation to pay the employee?  See Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1969); Melancon v. Amoco Production Co., 834 F.2d 1238, 1244 (5th Cir.), rehearing granted on other grounds, 841 F.2d 572 (5th Cir.1988), & Brown v. Union Oil Co., 984 F.2d 674,677 (5th Cir. 1993).

There is no genuine issue of material fact in opposition to the following propositions:

1.   That FMT had  complete control, direction and exclusive supervision over the work Plaintiff LANGFITT  performed while assisting in the loading of the SJARD, and that Able Body has never sent any supervisors to Port Manatee to monitor their temporary laborers.[1]

2.   The  work  being performed at the time of the accident was that of  FMT, and not Able Body.[2]

3.   There was an ongoing verbal agreement in place since April 2005, as well as a written work order dated December 13, 2007, between FMT and  Able Body pursuant to which Plaintiff, a temporary laborer, was assigned that day by Able Body to work as a borrowed servant of, and for,  FMT loading the SJARD along with other Able Body temporary laborers and full-time, permanent FMT supervisors and employees .[3]

---

[1]See Depo. Langfitt, p. 135, l. 1 - p. 138, l. 7; Depo. Layton, p.19, l.1- 4 ; Depo. Collins, p. 28, l. 16 -  p. 29, l. 20 ; Depo. Swan, pp. 57, l.14 - p. 59, l. 2; Depo. Thompson , p. 41, l. 9 - p. 42, l. 9; Depo. Karen Christy, Able Body, p. 35, l. 5-12; Depo. Adesi, p. 36, l. 7- p. 36, l. 7; Depo. Facciponte, p. 35, l. 3-9; Depo. Blodgett, p. 26, l. 18–p. 27, line 9.

[2]See Depo. Langfitt, p. 146, l. 1; Depo Layton, p. 19, l.16 - p. 21, Depo. Collins, p. 30, l. 16 - p.31, l. 16; Depo. Swan, p. 59, l. 3-21; Depo. Thompson, p. 40, l. 3-4 ; Depo. Christy, p. 35, l. 19 - p. 36, l. 14; Depo. Adesi, p.37, l.8 - 25 ; Depo. Facciponte, p.35, l. 10-14 ; Depo. Blodgett, p. 29, l. 2-11.

[3]See Depo. Langfitt, p. 141, l.18 -p. 142, l. 2; Depo. Layton, pp. 19, l. 22 - p. 20, l. 8; Depo. Collins, p. 31, l. 17 - p. 32, l. 6; Depo. Swan, p. 60, l. 4 - p. 61, l. 14; Depo. Thompson, p. 37, l. 10 - p. 40, l. 13; Depo. Christy, p. 11, l. 10 - p. 13, l. 21, p. 18, l. 4 - p. 19, l.15, p. 25, l. 12 - p. 26, l. 23 &  p. 36, l. 16 - 24; Depo Adesi, p. 39, l. 7 - 25.; Depo. Facciponte, p. 34, l. 5 - p.37, l..7; Depo. Blodgett, p.29, l. 18-25; p. 34, l. 16 – p. 38, l. 18.

4.    That Plaintiff LANGFITT did, in fact, "acquiesce" to the new work situation due to the inherent nature of temporary day labor employment and the caselaw interpreting this element, and also the fact that he voluntarily chose, after due consideration, to remain on the job after initially having reservations about work safety.[4]

5.    That the original, "lending" employer, Able Body, did temporarily terminate its relationship with Plaintiff LANGFITT "while the borrowing by FMT occurred", i.e. while he was "on the job" for FMT after being loaned to FMT by Able Body, thereby favoring "borrowed servant" status for FMT.[5]

6.    That FMT provided the tools (e.g., dunnage and any needed safety equipment) as well as the place for performance of Plaintiff's job duties at its Port Manatee, Florida terminal and dock, adjacent to which the SJARD was moored.[6]

7.    That, while the new employment by Plaintiff LANGFITT was not over a considerable length of time, caselaw nevertheless dictates that this factor remain neutral rather than disfavoring FMT.[7]

8.    That FMT clearly and unequivocally had the right to terminate or discharge temporary laborers such as Plaintiff LANGFITT if necessary and as needed, and that FMT has done so on many prior occasions with other temporary laborers at its Port Manatee facilities.[8]

9.    That Able Body merely served as a conduit from FMT to payment of Plaintiff LANGFITT'S wages, based upon time records completed by FMT supervisors

---

[4] See Depo. Langfitt, p. 147, l. 1 - 13, p. 158, l. 9 - p. 159, l. 8.; p. 77, l. 12 – p. 79, l. 3.

[5] See Depo. Langfitt, p. 133 – 8; Depo. Swan, p. 63, l. 24 - p. 64, l. 4; Capps, infra; Ruiz, 413 F.2d, 313.

[6] See Depo. Langfitt, p. 133 – 8; Depo. Layton, p. 22, l. 13 - p. 23, l.15; Depo. Collins p. 31, l. 10 - 12, p. 32, l. 4 - p. 33, l. 1; Depo. Swan, p. 65, l. 16 - p. 66, l. 15 ; Depo. Thompson, p. 43, l. 8 - p. 44, l. 5; Depo. Christy, p. 25, l.12-14; Depo. Adesi, p. 41, l.1 - 23 and p. 43, l. 1 - 22 .

[7] See Depo. Langfitt, p. 147, l. 1 - p.148, l. 6; Brown v. Union Oil Co.; 984 F.2d 674, 679 (5th Cir. 1993); Capps v. N.L. Baroid - N.L Industries, Inc., 784 F.2d 615, 617 (5th Cir. 1986).

[8] See Depo. Langfitt, p. 142, l. 9 - p. 145, l. 5; Depo. Layton, p. 23, l. 16 - p. 24, l. 11; Depo. Collins, p. 33, l. 1 - 22; Depo. Swan, p. 62, l. 7 - p. 63, l. 22; Depo. Thompson, p. 44, l. 6 - 20; Depo. Christy, p. 37, l. 8 - 25; Depo. Adesi, p. 41, l. 24 - p. 42, l. 25 ; Depo. Facciponte, p. 36, l. 5 - 11; Depo. Blodgett, p. 31, l. 2-8.

reflecting the number of hours he and the other temporary laborers worked for FMT, thereby favoring borrowed servant status for FMT.[9]

WHEREFORE, for the reasons stated above, and more fully delineated in Defendant FMT's Memorandum of Law in support of this motion , and  in the depositions, interrogatory answers or other documents on file with the Court, Defendant FMT respectfully moves this Honorable Court to enter Summary Final Judgment in its favor as a matter of law holding that: (1) Plaintiff LANGFITT was, at all times material hereto, a "borrowed servant" or "borrowed employee" of FMT under the nine-element <u>Ruiz</u> case and standard of review; and (2) that FMT in Count I of Plaintiff's Amended Complaint is therefore entitled to worker's compensation immunity from suit, and that Count  I is  barred by 33 USC §905(a) and case law construing same from the imposition of any civil liability against FMT in the instant personal injury litigation.

## MEMORANDUM OF LAW ON STANDARD OF REVIEW

The instant case is <u>not</u> one of first impression for FMT and its use of temporary, day laborers at its Port Manatee, Florida premises for injuries to those temporary laborers, and resulting personal injury lawsuits against FMT,  occurring during the course and scope of their temporary "borrowed servant" employment–see <u>Kostanich v. Federal Marine Terminals, Inc.</u>, 908 So.2d 1069 (Fla. 2d DCA 2005), a copy of which is attached as Exhibit  "A" to FMT's Appendix of Exhibits, Kostanich's and FMT's appellate briefs (Exh.'s "B" & "C"),

---

[9]See  Depo. Langfitt, p. 156, l. 3- 4; Depo. Layton, p. 24, l. 12 - p. 25, l. 12; Depo Swan, p. 64, l. 10 - p. 65, l. 6; Depo. Thompson, p. 44, l. 21 -  p. 45, l. 15; Depo. Christy, p. 45, l. 16 - p. 46, l. 6.

and 8/11/04 hearing transcript (Exh."D"). While not controlling or binding legal precedent, such unpublished "per curiam" opinions by an appellate court are indeed persuasive insofar as their legal analysis warrants in any given fact situation–see Bonilla v. Baker Concrete Construction, Inc., 487 F.3d 1340 (11th Cir. 2007). In that case, summary judgment in favor of FMT by the trial court was affirmed, per curiam, by the 2nd District Court of Appeal.

The Longshore and Harbor Workers Compensation Act ("LHWCA") provides that every employer which falls under the LHWCA shall be liable to its employees for workers compensation benefits due and owing its employees.   Canty v. A. Bottacchi, S.A. de Navegacion, 849 F.Supp. 1552, 1556 (S.D. Fla. 1994), citing 33 USC §904.  Such Federal workers compensation liability is exclusive and in place of **all** other liability, and extends to fellow servants of the injured employee.  Id., citing 33 USC §§905(a); Perron v. Bell Maintenance & Fabricators, Inc., 970 F.2d 1409, 1410 (5th Cir. 1992), cert. denied, 507 U.S. 913 (1993). It is factually undisputed herein that LHWCA worker's compensation benefits were immediately provided to Plaintiff BRUCE LANGFITT by AIG subsidiary, American Home Assurance Co. under an insurance policy procured pursuant to both  an  ongoing verbal agreement of over two years existence, and later a written work order on the date of accident, December 13, 2007 between FMT and Able Body Labor Temporary Services , pursuant to which FMT is both a Certificate of Insurance holder and an endorsed "alternate employer" insured[10]; as a result, Defendant FMT is immune from suit in this personal injury civil litigation based upon 33 USC§905(a) and the "borrowed servant" doctrine.

---

[10]The AIG/American Home policy, with relevant endorsements (see pgs. 43 & 49), is attached as Exhibit "E" in FMT's Appendix of Exhibits; moreover, a copy of the 12/13/07 work order (2-sided) is attached as Exhibit "F" of FMT's Appendix of Exhibits

33 USC §903, titled "Coverage," provides LHWCA coverage with "...respect [to] disability or death of an employee, but only if the disability or death results from an injury ***occurring upon the navigable waters of the United States (including any adjoining pier, wharf***, dry dock, terminal, building way, marine railway, ***or other adjoining area customarily used by an employer in loading***, unloading, repairing, dismantling, or building ***a vessel***" (emphasis added).  It is important in this case to note that Florida State Law on workers compensation immunity does not apply under the factual circumstances at issue; rather Federal Law governs due to the LHWCA coverage over this industrial accident.  See Gaudet v. Exxon Corp., 562 F.2d 351, 357-8 (5th Cir. 1977).  Also on an  important note, 33 USC §905(a) of the LHWCA, titled "Employer liability; failure of employer to secure payment of compensation," states, inter alia, that:

> The **liability of an employer** prescribed in §904 of this title **shall be exclusive and in place of all other liability of such employer to the employee**, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, except that if an employer fails to secure payment of compensation as required by this chapter, an injured employee, or his legal representative in case death results from the injury, may elect to claim compensation under the chapter, or to maintain an action at law or in admiralty for damages on account of such injury or death.

It is well settled as a matter of law under the LHWCA that 33 USC §905(a) "...makes [workers] compensation benefits the exclusive remedy available to an injured worker from his employer."  Total Marine Services, Inc.  v.  Director, OWCP, 87 F.3d 774, 777 (5th Cir. 1996).  Moreover, it is equally well settled as a matter of law that a plaintiff covered under the LHWCA has no cognizable or recognized tort relief, or tort cause of action under Florida

or other law, because the Federal Supremacy Clause specifically and expressly preempts competing or inconsistent state law tort remedies. Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935, 950–952 (3d Cir. 1990); see also Schneidewind v. A.N.R. Pipeline Co., 485 U.S. 293, 108 S.Ct. 1145, 1150-51, 99 L.Ed.2d 316 (1988), and Rosetti v. Avondale Shipyards, Inc., 821 F.2d 1083 (5th Cir. 1987), cert. denied, 44 U.S. 1008 (1988); Lorton v. Diamond M Drilling Co., 540 F.2d 212 (5th Cir. 1976). The Court in Peter, supra at 950-1, held that, "[i]n determining the reach of § 905(a), we begin by considering its language. .... This section's plain language evinces an unmistakable intention to codify the quid pro quo that underlies most workmen's compensation statutes–the employer provides no-fault compensation in exchange for immunity from tort liability for damages. Indeed, the [U.S.] Supreme Court has often opined that the LHWCA embraces this quid pro quo:

> The Act is not a simple remedial statute intended for the benefit of workers. Rather, it was designed to strike a balance between the concerns of the longshoremen and harbor workers on the one hand, and the employers on the other. Employers relinquished their defenses to tort actions in exchange for limited and predictable liability. Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail. Morrison- Knudsen Construction Co. v Director, OWCP, 461 U.S. 624, 636, 103 S.Ct. 2045, 2052, 76 L.Ed. 2d 194(1983) (other citations omitted).

As concluded by previous courts of law, and emphasized in Peter, supra at 951-2,

> [i]n the context of the policy decision reflected in § 905(a), we are unable to distinguish state imposed negligence liability from federally imposed negligence liability, and Peter [plaintiff] has tendered no suggestion as to why Congress might have wanted to grant immunity from the latter and not the former. Peter's judgment based on Virgin Islands law is every bit as disruptive of Congress' quid pro quo as would be a negligence judgment based on federal maritime law. Accordingly, we do not find it surprising that the only Court of

Appeals to have considered the issue has concluded that §905(a) bars a state tort recovery from a LHWCA employer. <u>Rosetti v. Avondale Shipyards, Inc.</u>, 821 F.2d 1083 (5th Cir.  1987), cert. denied, 484 U.S. 1008 (1988); <u>Lorton v. Diamond M Drilling Co.</u>, 540 F.2d 212 (5th Cir.  1976).

It is equally well-settled that, under the "borrowed servant" doctrine, the term "employer" in 33 USC §905(a) encompasses **both** general employers **and** employers who "borrow" a servant from that general employer.  <u>Huff v.  Marine Tank Testing Corp.</u>, 631 F.2d 1140 (4th Cir.  1980); <u>Peter v.  Hess Oil Virgin Island's corp.</u>, 903 F.2d 935, 938-9 (3d Cir.  1990); <u>Gaudet v.  Exxon Corp.</u>, 562 F.2d 351 (5th Cir. 1977). The 5th Circuit Court of Appeals has held that

> [t]here is no requirement that tort immunity under §905(a) attaches ***only to*** an employer who actually pays for his employees' worker's compensation (i.e., the premiums for the worker's compensation insurance coverage), although this conclusion might seem to be implied by the 1984 amendment to §905(a); <u>West v. Kerr – McGee</u> , 765 F.2d 526, 530 (5th Cir. 1985), however, explains the real meaning of this amendment to  §905(a).   <u>Melancon v. Amoco Production Co.</u>, 834 F.2d at 1247, f.n. 17 (emphasis added).

Moreover, a plaintiff's employment relationship with a defendant/employer, or more specifically  his status as a "borrowed servant," is undeniably a question of law.  <u>Canty v. A. Bottacchi, S.A. de Navegacion</u>, 849 F.Supp. 1552, 1556 (S.D. Fla. 1994); <u>Melancon v. Amoco Prod. Co.</u>, 834 F.2d 1238, 1244 (5th Cir. 1988); <u>Capps v. N.L. Baroid-NL Industries, Inc.</u>, 784 F.2d 615, 617 (5th Cir.1986) (citing <u>Gaudet v. Exxon Corp.</u>, 562 F.2d 351, 357-58 (5th Cir.1977)), cert. denied 479 U.S. 838 (1986).

The 5th and 11th Circuit Courts of Appeal use  a nine-factor test established by <u>Ruiz</u>

v. Shell Oil Company, 413 F.2d 310 (5th Cir.1969)[11], citing Standard Oil Co. v Anderson, 212

U.S. 215, 224 (1909), to determine borrowed employee status. See also Melancon v. Amoco

Production Co., 834 F.2d 1238, 1244 (5th Cir.), reh'g granted on other grounds, 841 F.2d 572

(5th Cir.1988).

The nine Ruiz factors are:

    1.    Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

    2.    Whose work is being performed?

    3.    Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

    4.    Did the employee acquiesce in the new work situation?

    5.    Did the original employer terminate his relationship with the employee?

    6.    Who furnished the tools and place for performance?

    7.    Was the new employment over a considerable length of time?

    8.    Who had the right to discharge the employee?

    9.    Who had the obligation to pay the employee?

Although no single factor is wholly dispositive, it is undeniable that a greater

emphasis is usually placed on the first factor, namely control of (or over) the employee and

his/her work activities. See Rosetti v. Avondale Shipyards, Inc., 821 F.2d 1083, 1085 (5th

---

[11]See Bonner v. City of Prichard, Alabama, 661 F.2d 1206 (11th Cir. 1981) – decisions of the Fifth Circuit Court of Appeals, as that Court existed on September 30, 1981, handed down by that Court prior to close of business on that date, would be binding as precedent on Eleventh Circuit , established on October 1, 1981 for Court of Appeals, District Courts and Bankruptcy courts in that Circuit, absent subsequent abrogation by the Eleventh Circuit.

Cir. 1987), cert.denied, 484 U.S. 1008, 108 S. Ct. 703, 98 L.Ed.2d 654 (1988), and  Brown

v. Union Oil Co., 984 F.2d 674, 677 (5th Cir.1993)– "central factor is who has control over

employee and work he is performing, beyond mere suggestion of details or cooperation."

The Fifth Circuit qualified such a proposition in Capps v. N.L.Baroid–NL Industries, Inc.,

784 F.2d 615, 617 (5th Cir. 1986) by stating "[t]he first, and most important, factor is : who

has control over the employee and the work he is performing, beyond mere suggestion of

details or cooperation?"  The Fifth Circuit in  Melancon , 834 F.2d at 1244 – 5, also held that

"[t]he first factor, the question of who has control over the employee and  the work he is

performing, has been considered the central issue of "borrowed employee" status in some of

our cases, e.g. Hebron v Union Oil Co., 634 F.2d at 247, although not necessarily

determinative. " The Fifth Circuit has also held, however, that another principal focus within

the test of applicability of the "borrowed employee" doctrine was also on whether the second,

or borrowing, employer itself was responsible for the working conditions experienced by the

employee and the risks inherent therein. Gaudet v. Exxon Corp., 562 F.2d 351, 357 (5th Cir.

1977).

On the second Ruiz "borrowed servant/employee" element - whose work is being

performed? -  the focus is on whether the employee is performing the "borrowing"

employer's work as opposed to the "lending" employer's work . See Capps, supra at 617 ;

Melancon, supra at 1245; Gaudet, supra at 355.

On the third Ruiz element - was there an agreement, understanding, or meeting of the

minds between the original and borrowing employer? - the focus is on whether there was a

verbal or written agreement or understanding between the "lending" and "borrowing" employer sufficient for a cogent argument to be made that the original employer "loaned" the employee, a temporary laborer, to the "borrowing" employer at the time of the accident and injury at issue. Capps, supra at 617; Melancon, supra at 1245 – 6 .

On the fourth Ruiz element - did the employee acquiesce in the new work situation? - the 5th Circuit Court of Appeals in Capps, supra at 617, has expressly stated that, in temporary laborer scenarios, those  temporary laborers know, by working for such a temporary labor company,  that that company "...would send him into new work situations..." on such a regular basis such that those temporary laborers continually acquiesce in their new work situations simply given the fact that they were, and are, *constantly* sent into "new" work situations. It is noteworthy that, in Capps, the injured employee was supplied by a company specializing in supplying general laborers to companies in need of  temporary help, and that that employee, who just like Plaintiff  LANGFITT  herein, was injured *on his first day* on the job working for NL Baroid; the 5th Circuit  nonetheless affirmed summary judgment in favor of NL Baroid, holding that "[s]ince Capps worked for a company that loaned temporary employees, Capps knew [that] Davis would send him into new work situations. Thus, going into new work situations *was* Capps' work situation. When he went to work for Davis ["lending"employer], he acquiesced to the fact that Davis would constantly send him into new work situations." Capps, 784 F.2d at 617 (emphasis added). See also Melancon, 834 F.2d at 1246"

Melancon clearly acquiesced in his new work situation, the fourth factor under Ruiz.  He knew before he began to work on Amoco's offshore platforms in

1977 what his work conditions would be, and he made no complaint regarding these conditions to Beraud ["lending" employer] or to Amoco ["borrowing" employer].

On the fifth "borrowed servant/employee" element - did the original employer terminate his relationship with the employee? –  the Fifth Circuit has held that  "[t]he emphasis when considering this factor should focus on the lending employer's relationship with the employee ***while the borrowing occurs***,"  rather than mandating that "...this factor require  a lending employer to completely sever his relationship with the employee" since "[s]uch a requirement would effectively eliminate the "borrowed employee" doctrine as there could never be two employers." See Capps, 784 F.2d at 617-8. (emphasis added)  The Capps Court held:

> The emphasis when considering this factor should focus on the lending employer's relationship with the employee while the borrowing occurs.  In the instant case, Davis ["lending" employer] exercised no control over Capps while he worked for Baroid ["borrowing" employer] and placed no restrictions on Baroid with respect to Capps' employment conditions.  Thus, while Capps worked for Baroid, Davis had temporarily terminated its relationship with Capps. Id.

As a result, it has been held that, by temporarily loaning its  laborers to others when needed, the temporary laborers themselves are deemed to have legally terminated its original employment relationship with the original, or "lending" employer but only "***while the borrowing occurs.***"  Capps, supra at 617-8 (emphasis added); see also Melancon, 834 F.2d at 1246, and Brown v. Union Oil Co. Of California, 984 F.2d 674, 678 (5th Cir. 1993). See also Ruiz, 413 F.2d at 313– "Implicit in the borrowed-servant conception ...is temporary termination by the general employer of its relationship with the servant."

On the sixth "borrowed servant" element - who furnished tools and place for performance? - the Court must look at both the place for performance <u>and</u> the furnishing of tools or equipment to perform the job tasks. <u>Capps</u>, supra at 618.

On the seventh "borrowed servant" element - was the new employment over a considerable length of time? - Defendant FMT agrees that it cannot satisfy this element since Plaintiff LANGFITT was injured on his first day on this particular job. Nonetheless, the Fifth Circuit  noted in <u>Capps</u> that "[w]here the length of employment is considerable, this factor supports a finding that the employee is a borrowed employee; ***<u>however, the converse is not true</u>***." 784 F.2d at 618 (emphasis added). There, Capps' injury likewise occurred on his first day of work, and  this [Fifth Circuit] Court concluded [in a similar temporary labor scenario] that this seventh factor was neutral." See  <u>Brown v. Union Oil Co. of California</u>, 984 F.2d 674, 679 (5th Cir. 1993), citing <u>Capps</u>, supra at 618. As a result, the fact that LANGFITT was injured on his first day on the job with FMT does not disfavor FMT in the "borrowed servant" analysis; rather, it is a neutral element under  <u>Capps</u> and <u>Brown</u>.

On the eighth "borrowed servant" element - who had the right to discharge the employee? -  the sole focus for purposes of this nine-element test is on whether or not the "borrowing" employer has the right to discharge the employee from ***<u>its employment</u>***, rather than any  ability to terminate the employment relationship between the original, "lending" employer and that employee. <u>Hebron v. Union Oil Co.of California</u>, 634 F.2d 245 (5th Cir. 1981); <u>Capps</u>, supra at 618; <u>Melancon</u>, supra at 1246; <u>Brown</u>, supra at 679.

On the ninth "borrowed servant" element - who had  the obligation to pay the

employee? - the trial court is not supposed to limit its inquiry on which employer has the initial, or primary, obligation to pay the employee, and instead must focus on whether the original, "lending" employer was merely a conduit for payment of that employee by the "borrowing" employer, based upon the amount of hours that he/she worked for the "borrowing" employer.  See <u>Capps</u>, supra at 618, wherein the Court held:

> While Davis ["lending" employer] had the obligation to pay Capps, Davis received the funds to pay Capps from Baroid ["borrowing" employer].  Since Baroid paid Davis at a hourly rate for Capps' work, and since Davis paid Capps at a lower hourly rate, Baroid in essence paid  Capps. See <u>Champagne v. Penrod Drilling Co.</u>, 341 F. Supp. 1282, 1285 (W.D. La. 1971).  Because of this fact, the last factor does not detract from the District Court's ruling [granting summary judgment in favor of Baroid].

See also <u>Melancon</u>, 834 F.2d at 1246, wherein the Court held:

> Finally, ***we agree the District Court was correct in finding that Amoco paid Melancon's wages via Beraud*** ["lending" employer] ***based on the number of hours Melancon worked  for Amoco***. The fact that Beraud kept  a  percentage of the amount Amoco was charged is not relevant.  ***Amoco furnished the funds from which Beraud paid Melancon, and  this is the determinative inquiry for this factor***. (Citations omitted; emphasis added).

See also <u>Brown</u>, supra at 679, wherein the court held:

> Gulf Inland ["lending" employer]  paid Brown, but his pay was based on time tickets that had to be verified daily by Union ["borrowing" employer] .  This procedure supports borrowed employee status. <u>Alexander v. Chevron, USA</u>, 806 F.2d  526, 528 (5th Cir. 1986).

The "borrowed servant" or "borrowed employee" doctrine was initially recognized by the U.S. Supreme Court in <u>Standard Oil Co v. Anderson</u>, 212 U.S. 215 (1909), and "[t]he doctrine was established to hold a  borrowing employer liable under *respondeat superior* for the negligence of any employee he had borrowed. Only beginning with <u>Ruiz v. Shell Oil Co.</u>,

413 F.2d 310 (5th Cir. 1969) did this [Fifth] Circuit adopt the "borrowed employee" doctrine to give borrowing employers a shield from tort liability from their borrowed employees under [the] LHWCA." <u>Melancon v. Amoco Production Co.</u>, 834 F.2d 1238, 1244 (5th Cir. 1988), citing <u>Gaudet v. Exxon Corp.</u>, 562 F.2d at 355-6, <u>Doucet v. Gulf Oil Corp.</u>, 783 F.2d 518, 522 (5th Cir. 1986), cert.den'd, sub nom <u>Gulf Oil Corp.v. Danos & Curole Marine Contractors, Inc.</u>, 479 U.S. 883 (1986), and <u>Hall v. Diamond M Co.</u>, 732 F.2d 1246 (5th Cir. 1984).

The issue before the Court is whether Plaintiff, LANGFITT was the "borrowed employee" of Defendant, FMT pursuant to the LHWCA and the nine-element <u>Ruiz</u> test. If the Court answers that question in the affirmative, LANGFITT cannot maintain the present action against FMT and entry of summary judgment in this Defendant's favor is appropriate as a matter of law.

## STATEMENT OF UNDISPUTED FACTS

At approximately 5:00 a.m. on December 13, 2007, Plaintiff, LANGFITT rode his bicycle to the Seffner offices of Able Body Temporary Services, Inc., a temporary employment agency in the business of providing temporary "day labor" to a multitude of businesses, including Defendant FMT. (Depo. Christy, p. 9, l. 7-10). Upon arrival at Able Body, Plaintiff was assigned to work for FMT at Port Manatee for that day and was issued a safety vest and hard hat by Able Body employees. (Depo. LANGFITT, p. 62, l. 15 - p.64, l. 22). No additional equipment or tools were issued to Plaintiff by FMT; however, it is undisputed that FMT or the vessel supplied all necessary tools, such as cranes and certain types of dunnage to be used to load and store the cargo, and that FMT could, and did, provide

16

needed safety equipment to the temporary laborers if Able Body didn't. (Depo. LANGFITT, p. 146, l. 9-22; Depo Collins, p. 32, l. 13 - p. 33, l. 1; Depo. Swan, p. 65, l. 16-25; Depo. Adesi, p. 22, l. 8-14; p. 43, l. 111; Depo. Blodgett, p. 30, l. 14-p. 31, l. 1; Depo. Thompson, p. 43, l. 8 - p. 44, l. 5).

Plaintiff was assigned to work for FMT to assist in loading the components of a previously disassembled sugar mill into the #2 hold of the seagoing cargo vessel, the "SJARD" which was docked at FMT's Port Manatee ship terminal.  One component of the cargo was an "over fire air fan with casing,"which weighed 4,480 pounds (hereinafter, "the Fan") (Complaint ¶¶6-11).  Plaintiff and four (4) other Able Body temporary day labor employees, Dave Mullins, Russell Clark, Teddy Rodrick, and Danny Day were transported in a personal vehicle owned by one of the day laborers to Port Manatee, where they signed in at the gate and were "told to report to Jeff [Swan]" [12] aboard the SJARD.  (Depo. LANGFITT, p. 68, l. 1- 25; p. 71, l. 18 -  p. 72, l. 7).  Plaintiff agreed that no Able Body supervisor either accompanied them to, or directed their work activities at, FMT's Port Manatee facility, and that Jeff [Swan] "or anybody with the radio" at FMT was " his boss";  Plaintiff agrees that, whatever Jeff or any other individual with a radio told him to do, he listened to him and did it. (Depo. LANGFITT, p. 134, l. 6-11; p. 135, l.13 - p.137, l. 20).  Able Body has  never provided any supervisor(s)  to oversee the work activities of its laborers while working for FMT, and none  accompanied Plaintiff's work crew that day.  (Depo. Thompson, p.41, l. 23 -

---

[12]Jeff Swan (hereinafter, "Swan") was  a full-time employee of FMT in the position of "hold foreman" or "header" in hold number 2 of the SJARD on the day of the incident at issue. (Depo. Swan, p.10, l. 23-25).

p. 42, l. 4; Depo. Blodgett, p. 29, l. 5-12; Depo. LANGFITT, p.135, l. 19-25)

Once aboard the ship, Plaintiff told another temporary laborer: "I'm not really feeling right being down here and everything. This don't feel right.  He said, 'Dude, you go up to that hatch, you might as well keep going home.'" Although Plaintiff did not know who that person [from Able Body] was, he understood that statement to mean, "you leave where you're at, you're fired."  (Depo. LANGFITT, p. 77, l.12 - p.79, l. 3).   Plaintiff remained on the job site and did not "go up the hatch."[13]  Plaintiff understood that if someone at FMT wanted to "fire" him or terminate his services, they had the ability to do so.  (Depo. LANGFITT, p. 144, l. 21-p.145, l. 7).   LANGFITT admitted that he had seen other Able Body employees sent home involuntarily from jobs prior to December 13, 2007,  and that the supervisors at FMT could fire him if they wanted to. (Depo. LANGFITT, p. 142, l. 3 - p. 144, l. 5). FMT clearly had the authority to discharge or terminate the employment of temporary laborers supplied by Able Body and other temporary staffing agencies, and FMT had done so on numerous prior occasions. (Depo. Collins, p. 33, l. 2-22; Depo. Adesi, p. 41, l. 24 - p. 42, l. 25 ; Depo. Christy, p. 37, l. 8 - p. 38, l. 1; Depo. Blodgett, p. 31, l. 2-8; Depo. Facciponte, p. 36, l. 5-11). Whilst still in the hold, Swan told Plaintiff to "Stand right here.  Don't move until I tell you to and just help me out with what I need help with." (Depo. LANGFITT, p. 81, l. 11-21).  As the Fan was being lowered into the hold by a crane, Swan instructed Plaintiff and some other

---

[13]Factor #4 pursuant to <u>Ruiz v. Shell Oil Co.</u>: "Did the borrowed employee acquiesce that he was temporarily under the control of the borrowing employer?" "The issue to be resolved under this factor is whether [Plaintiff] had an opportunity to observe the conditions under which he was working and whether, after such an opportunity, he chose to continue working." <u>Brown</u>, 984 F.2d at 678.

workers to obtain some dunnage[14] to place beneath the Fan.  After doing so, Plaintiff attempted to return back to where Swan was standing, but the dunnage below the Fan gave way, and "exploded," and the Fan shifted and fell onto Plaintiff's body . (Depo. LANGFITT, p. 83, l. 11 - p. 84, l.17).   Plaintiff was thereafter lifted out of the ship's hold by the same crane in a gurney, and thereafter transported by helicopter to Bayfront Medical Center in St. Petersburg . (Depo. LANGFITT, p.104, l.18-25).

At all times material hereto, Defendant FMT was acting as the stevedore company responsible, along with BBC Chartering and its Port Captain, James Bond,  for loading the Cargo aboard the SJARD, which was clearly, unequivocally, and undisputedly under the direction, supervision and control of FMT, and its supervisors rather than Able Body. (Depo. Thompson, p. 5, l.17-18; p. 13, l. 2-5)(Depo. Adesi, p. 37, l. 1-7)(Depo. Blodgett, p. 26, l. 18-25; p.29, l. 13-19, see fn 1 of this Motion). At the time of the incident, it was the work of FMT that was being performed by Plaintiff and not that of Able Body. (Depo. LANGFITT, p. 146, l. 4; Depo. Adesi, p.  37, l. 8-25; Depo. Christy, p.35, l. 19- p. 36, l. 14; Depo. Blodgett, p.29, l. 2-11; Depo. Facciponte, p.35, l. 10-14; see fn 2 of this Motion).  Able Body had no control or interest whatsoever in the loading of the SJARD or the work being performed by the Plaintiff or the other borrowed servants, except for supplying said servants to FMT and receiving compensation from FMT for the provision of  their labor. (Depo. Christy, p. 9, l. 3-16; p. 35-6; Depo. Facciponte, p. 35-7).

---

[14]Dunnage is described as lumber (in this case  4  by 4 inch pine, or 3 by 3 inch pine) used to prevent the metal cargo from contacting the surfaces of the cargo hold and/or other pieces of cargo and to secure the cargo from shifting during transportation.  FMT undisputedly provided the 3 x 3 wood, while the vessel owners provided the 4 x 4 wooden dunnage.

Plaintiff simply performed the work of Defendant, FMT, as directed by Jeff Swan, as he assisted with loading the sugar mill components into the cargo hold of the SJARD. Conversely, Able Body was merely a "nominal" temporary labor supplier which had no work to be performed aside from supplying a labor force to "borrowing" employers.  Plaintiff was only performing work for FMT, and no one else (Depo. Christy, p. 36, l. 14; Depo. Facciponte, p. 35, l. 7-14),  and there is no dispute that FMT had the right and ability to discharge Plaintiff, if necessary and if it so chose (Depo. Christy, p. 37, l. 8 - p. 38, l.1; Depo. Facciponte, p. 36, l. 5-15; see fn 8 of this Motion).

FMT did not directly compensate workers supplied by Able Body. Instead, FMT compensated Able Body at a previously agreed-upon hourly rate for each hour of work performed by every  worker supplied by Able Body, and Able Body in turn compensated its workers **after** the amount of hours each employee worked that day was verified by an authorized FMT supervisor. (Depo. Blodgett, p. 21, l. 13-18 ; Depo. Thompson, p.37, l. 16- p. 38, l. 19; Depo. Facciponte, p.34, l. 5- p. 35, l. 2 ; Depo. Christy, p. 43, l. 10-p. 44, l. 11) Each time Able Body supplied a worker to FMT, Able Body furnished FMT with a work order that contained information including but not limited to the name of the borrowing employer, the date and time the work was to be performed, the names of the employees being supplied, and the type of work to be performed.  (Depo. Christy, Ex. 8 ; Depo. Blodgett, p. 17, l.13 - p.18, l. 7; Depo. Thompson, p.37, l.16-p. 38, l. 19)  At the end of the shift, a supervisor employed by FMT signed the work order attesting to the amount of hours worked by each borrowed employee such that FMT had a record to pay Able Body, and upon which Able

Body  paid the borrowed employees according to the number of hours checked off by the FMT supervisor. (Depo. Collins, p. 30, l. 2- 11; Depo. Christy, p. 43, l. 20 - p. 44, l. 9). Like the other temporary employees, LANGFITT was to be paid at the end of the day by Able Body, but only if an FMT representative checked off on the list of employees who: (1) showed up that day; and (2) as to the number of hours that each of those temporary employees worked that day. (Depo. Facciponte, p. 34, l. 5 - p. 35, l. 2; Depo. Thompson, p. 37, l. 10 - p. 39, ln. 7). On the date of accident herein, Cargo Superintendent Les Thompson from FMT signed off on the Able Body work order in question. (Depo. Thompson, p. 37, l. 10 - p. 39, l. 14 )

Aside from the safety equipment supplied to Plaintiff by Able Body, all of the tools , equipment and the location necessary to accomplish the task of loading the Cargo onto the SJARD were furnished by FMT, or in certain cases involving certain types of dunnage, (4 by 4s)  or the ship's crane, by the vessel owner. (Depo. Adesi, p. 41, l. 13 - 23)(Depo. Christy, p. 38, l. 2 - 20)(Depo. Blodgett, p. 30, l. 1-13).

The undisputed factual evidence therefore shows that, at all times material hereto, Plaintiff was nominally employed by Able Body and supplied to FMT pursuant to both an ongoing verbal agreement or arrangement, in effect since 4/05,  **and also** a written "work order" agreement between FMT and Able Body , and sent  to the FMT terminal to load the "knock-down" sugar mill at its Port Manatee terminal adjacent to Tampa Bay. (Depo. Christy, p. 23, l. 20-23)  FMT clearly had sole and exclusive direct supervision over the Able Body temporary laborers once they arrived at FMT (Depo. Christy, p. 34, l. 11 - p. 35, l. 12, see fn

3).  FMT was, according to the work order in question, "solely responsible for supervising and

directing the activities of the [Able Body] workers between arrival at and departure from the

jobsite." (Depo. Christy, Exhibit 7, ¶ 4).  It is undisputed that the 12/13/07 Able Body Work

order for FMT constitutes a written agreement between those two entities for the provision

of temporary laborers on 12/13/07 to help load the SJARD.  (Depo. Thompson, p. 42, l. 12-19;

Depo. Blodgett, p. 29, l. 12-25; Depo. Facciponte, p. 34, l. 5 - p. 35, l. 2).

Also undisputed is the fact that Plaintiff and the other Able Body temporary day

laborers were all covered under a policy of general liability insurance  issued to Able Body

on 11/29/2007 by AIG subsidiary  Lexington Insurance Company, and which also named

FMT as the certificate of insurance  holder on that policy. (Depo. Christy, p. 42, l. 8-24; Ex.

6).  Moreover, at all times material hereto, Plaintiff and the other temporary workers were

covered under a policy of worker's compensation insurance issued by another AIG subsidiary,

American  Home  Assurance  Company  which  provided  LHWCA  insurance  beginning

12/01/2007 through 12/01/08. (Depo. Christy, p. 42, l. 8-24; Ex. 9).  American  Home

Assurance  Company  has  undisputedly  provided  both  LHWCA  indemnity/wage  loss  and

medical benefits to Plaintiff, and continues to do so. (Plaintiff's Answers to Interrogatories,

¶13).  This latter worker's compensation insurance coverage was part of a contracted, or

bargained-for exchange, requirement between FMT and Able Body (see ¶ 3 of 12/13/07 Able

Body Work Order (2-sided document) attached as Exhibit 7  to deposition of Karen Christy,

and/or Exhibit "A" to deposition of Plaintiff), pursuant to which FMT paid a higher hourly

wage rate to Able Body for each temporary laborer supplied by Able Body to FMT  due to the

22

fact that Able Body was contractually responsible, under paragraph 3 of that daily work order in question, for providing the Longshore worker's compensation coverage for those temporary laborers.  (Depo Christy, p. 14, l. 17 – p. 15, l. 14; Depo. Blodgett, p. 35, l. 2-7).   It is furthermore undisputed that, not only was FMT the named certificate of insurance holder on both insurance policies providing liability and worker's compensation coverage, but that FMT is also a specifically endorsed insured under the American Home LHWCA coverage endorsement as an "Alternate Employer" under the terms, provisions or definitions of  that policy.  (See Exhibit "E" of FMT's Appendix of Exhibits, and Depo. Christy, p. 42, l. 8 - p. 43, l. 4 ; p. 52, l. 4-21; see also Exhibits  # 6 & #9 to said transcript).  There is no genuine issue of material fact to dispute the conclusion that, as part of the bargained-for exchange negotiation process with Able Body, FMT contracted for Able Body to provide Longshore worker's compensation coverage for the temporary laborers "lent" by Able Body to FMT while they were working for FMT under their work orders, in return for FMT paying a higher hourly wage rate to Able Body than it would if FMT were to provide, and pay for, that worker's compensation coverage.  (Depo. Blodgett, p.33, l. 16 - p. 35, l. 24 and p. 36, l. 25 - p. 38, l. 9; Depo. Facciponte, p. 24, l. 5-23; Depo. Christy, p.19, l. 18 - p. 20, l. 14 and p. 24, l. 4-8).  In fact, FMT Terminal Manager Carl  Blodgett testified  that, regardless of whether the rate quote was for skilled or unskilled laborers, he checked with Karen Christy at Able Body and was informed that there was an increased price difference in April 2005, of approximately $1.50 per laborer, per hour if Able Body were to provide the worker's compensation coverage.  (Depo. Blodgett, p. 35, l. 8-24; p. 36, l. 25 - p. 38, l. 9).  The

undisputed evidence also shows that there existed an informal, verbal agreement between FMT and Able Body as early as April 19, 2005, which was confirmed by a written wage rate verification sheet issued by Karen Christy of Able Body, whereby FMT paid Able Body a fee of $11.90 per hour for each unskilled Able Body laborer in consideration for, among other things, Able Body providing the laborers and workers compensation insurance coverage for said laborers, (Depo. Christy, p. 24, l. 12-23 and Ex.1; Depo. Blodgett, p. 18, l. 16 - p. 20, l. 17; p. 31, l. 9 - p. 32, l. 25; p. 33, l. 16 - p. 38, l. 9); it is also undisputed that Carl Blodgett inquired of Karen Christy later on in October 2005 as to what the cost to FMT would be if FMT were to provide that worker's compensation coverage, and the unrefuted testimony was that it would cost FMT $10.40 per hour for each unskilled laborer, and $11.20 per hour for each skilled laborer if FMT were to provide the worker's compensation coverage. (Depo. Blodgett, p. 36, l. 25 - p. 38, l. 9; Ex. 1 & 2). There is no dispute that FMT chose to pay the higher hourly wage rate, and to have Able Body provide the worker's compensation insurance coverage for the temporary day laborers at all times before, during and after Plaintiff's accident. (Depo. Christy, p. 14, l. 17 - p. 15, l. 14; Depo. Blodgett, p. 35, l. 2-7).

In summary, it cannot be disputed that **ALL NINE** of the controlling factors, described in <u>Ruiz v. Shell Oil Co.</u> to determine when the doctrine of borrowed servant is applicable, were met.

Moreover, because LANGFITT was covered for worker's compensation purposes by the LHWCA, 33 USC §901, et seq., <u>and</u> Plaintiff received compensation provided by Able Body, his "lending employer," (pursuant to its written contract with FMT as well as the

American Home Assurance Company LHWCA insurance policy covering <u>both</u> Able Body and FMT), there can be no doubt that the "borrowing employer" Defendant, FMT, is entitled to the immunities provided to Able Body  by 33 USC §905(a) under the borrowed servant doctrine.

**WHEREFORE**, for the reasons stated herein, Defendant FEDERAL MARINE TERMINALS, INC. moves this Honorable Court for entry of an order granting Defendants' Motion for Summary Judgment.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed and copies sent via. CM/ECF to JACOB J. MUNCH, ESQUIRE, Munch and Munch, P.A., 600 S. Magnolia Avenue, Suite 325, Tampa, FL 33606; TIMOTHY F. PRUGH, ESQUIRE, Prugh & Associates, P.A., 1009 W. Platt Street, Tampa, FL 33606; J. MICHAEL GRIMLEY, JR., Galloway, Johnson, Tompkins, Burr & Smith, PLC, 118 E. Garden Street, Pensacola, FL 32502; DAVID F. POPE, ESQUIRE AND TIMOTHY D. WOLF, ESQUIRE, P.O. Box 1438, Tampa, FL 33601; JASON P. WAGUESPACK, ESQUIRE, MICHAEL J. NICHAUD, ESQUIRE and DAVID N. LORIA, ESQUIRE, Galloway, Johnson, Tompkins, Burr & Smith, One Shell Square, 701 Poydras Street, 40th Floor, New Orleans, LA 70139, this 3rd day of September, 2009.

 s/ Donovan A. Roper
DONOVAN A. ROPER, ESQUIRE
Florida Bar No.: 858544
donroper@roperandroper.com
Roper & Roper, P.A.
email@roperandroper.com
116 N. Park Avenue
Apopka, FL 32703
Telephone:  (407) 884-9944
Facsimile: (407) 884-4343
Attorneys for Defendant,
FEDERAL MARINE TERMINALS, INC.

DAR:ddc